## AMERICAN TRUST CO. v. COMMISSIONER OF INTERNAL REVENUE.

Circuit Court of Appeals, Ninth Circuit.
February 25, 1929.

No. 5604.

Louis S. Beedy, of San Francisco, Cal., for petitioner.

Mabel Walker Willebrandt, Asst. Atty. Gen., and Sewall Key and Millar E. McGilchrist, Sp. Asst. Attys. Gen. (C. M. Charest, Gen. Counsel, Bureau of Int. Revenue, of Washington, D. C., of counsel), for respondent.

Before RUDKIN and DIETRICH, Circuit Judges, and BEAN, District Judge.

DIETRICH, Circuit Judge. On December 31, 1920, the American National Bank of San Francisco, hereinafter referred to as the petitioner, charged off on its books, and later in its income tax return for that year deducted from gross income, the sum of $68,538.41 as a bad debt. Disallowing the deduction, the Commissioner assessed an additional tax of $18,410.72. Petitioner appealed to the Board of Tax Appeals, and, failing to get relief, it comes here upon a petition for review.

The material facts are as follows: In April, 1920, at the request of Joseph De Bona, one of its customers, the Border National Bank of Eagle Pass, Tex., telegraphed to petitioner, and also to a concern known as Maldonado & Co., irrevocably guaranteeing payment for account of De Bona, covering a purchase by him through Maldonado & Co. of 200 tons of sugar. Following a report which it understood to be of the financial responsibility of the Eagle Pass Bank, but which in fact related to a bank at El Paso—an error it did not discover until several months later—and upon the request of Maldonado & Co., the petitioner issued its letter of credit to G. Amsinck & Co., the seller of the sugar. About two months thereafter the Eagle Pass bank wired petitioner that it revoked its guaranty or letter of credit, but petitioner declined to accept the revocation. Upon arrival of the sugar in November, drafts to cover the cost were refused by the Eagle Pass bank, and petitioner was compelled to make good its letter of credit. On December 31, 1920, it caused the sugar to be sold at a net loss of $68,538.41, which constitutes the item in question, and this upon the same day it charged off.

The statutory authority, if any there was, for making such deduction from gross income, must be found in section 234 (a) (5) of the Revenue Act of 1918 (40 Stat. 1057, 1078), which provides that, in computing the net income of a corporation, there shall be allowed as deductions: "Debts ascertained to be worthless and charged off within the taxable year." The only question, therefore, is whether, before the charge-off was made, the petitioner had "ascertained" the account to be "worthless." By reason of the relations existing between petitioner and Maldonado & Co., the latter was legally liable to petitioner, and there is little, if any, evidence of its financial responsibility—certainly no basis upon which to hold that it was then insolvent.

Upon grounds which we need not explain, the Eagle Pass bank denied liability, and, from the record of a general investigation made by petitioner's attorney, it would appear that it was not a strong institution, and the personal responsibility of the stockholders was measurably limited. But it had a capital stock of $100,000, with a surplus of a like amount, and was a going banking concern, not shown to have been insolvent in any sense of the term. That the petitioner believed it to be liable, and had some financial responsibility, is persuasively shown by the fact that at the very time the charge-off was made it was preparing to bring suit to recover the claim. Nine days later it in fact did bring such a suit in a United States court in Texas, and in due time recovered judgment for the full amount. It is scarcely credible that, if petitioner believed the claim worthless, it would have incurred the heavy expense of waging suit thereon in a distant jurisdiction.

Dissatisfied with the judgment, the Eagle Pass bank took an appeal, and, to stay execution, was able to procure from a surety company a supersedeas bond, which, upon an affirmance in the appellate court, was made good, and thus petitioner was paid the full amount of its claim, with costs.

Clearly, we think, under no reasonable construction can it be said that in 1920, or at any subsequent date, was the claim "ascertained" to be "worthless." The word "ascertain" means to find out, to make reasonably certain. Both in popular and law dictionaries that is the meaning assigned to it. True, the ascertainment need not be absolute, nor are a final judgment and return nulla

bona always prerequisites; and a claim may be duly "ascertained" to be presently worthless, though later it may turn out to be in fact collectible. But a debt cannot be written off as worthless merely because it is doubtful. Reasonable and intelligent effort must be made to determine its value, and the circumstances thus discovered must be such as reasonably to generate the belief that it is in fact worthless. Naturally no hard and fast rule can be laid down, and each case must be adjudged in the light of its own facts. Hence precedents involving distinctive facts are not of great value.

■ As overcoming the prima facie correctness of the Commissioner's finding (Wickwire v. Reinecke, 275 U. S. 101, 48 S. Ct. 43, 72 L. Ed. 184), with much earnestness the petitioner presses upon our consideration the last paragraph of article 151 of Regulations 62 (Comm. Reg. 8226, III—2 C. B. 116), which is as follows:

"Where banks or other corporations which are subject to supervision by federal authorities (or by state authorities maintaining substantially equivalent standards) in obedience to the specific orders, or in accordance with the general policy of such supervisory officers, charge off debts in whole or in part such debts shall, in the absence of affirmative evidence clearly establishing the contrary, be presumed, for income tax purposes, to be worthless or recoverable only in part, as the case may be."

Assuming, but not deciding, that, though it was not in effect in 1920, this regulation is applicable, we do not think it affords warrant for disturbing the conclusion of the Commissioner and of the Board of Tax Appeals. Admittedly there was no specific order by any public authority to make the charge-off. No bank examiner or other public officer gave testimony, and there was introduced in evidence no rule, regulation, or general instructions setting forth the conditions or outlining the principles guiding examiners or other supervising officers in giving directions to make charge-offs. The only evidence, if it can be called evidence, upon the point, consists of the testimony given by an officer of petitioner. This testimony was in effect that from his 10 or 12 years' experience the officer was familiar with the policy of national bank examiners respecting bad accounts, and that he wrote the item off

because he "believed it was in accordance" with such general policy. "The bank examiner," he said, "would not have allowed us to carry that as a live asset, because of the weakness of the Border National Bank, and Maldonado & Co. was not strong." He did not attempt to advise the Commissioner or the Board of Tax Appeals of any standard, rule, or principle employed or followed by examiners in determining when a debtor is so weak that his account should be charged off.

In the large group of a bank's debtors there must be innumerable degrees of "weakness," and divers considerations, such as the duration of delinquency, extent of efforts to collect, and the character of the debtor, must enter into the question whether or not, in a given case, at a given time, safe banking practice requires a charge-off. The Commissioner and the board may very reasonably have regarded it as incredible that, with the information, and only the information, the record here discloses to have been in the possession of the petitioner, a bank examiner would, upon the very day the amount of the obligation was first ascertained, so precipitately have required that it be charged off, when a business concern of some financial standing and a going bank with $100,000 capital and a surplus of an equal amount stood severally bound to discharge it. That being true, they were not compelled to accept the general opinion of a deeply interested witness, whose testimony was at most of doubtful competency. There had been no serious attempt to collect from Maldonado & Co., or persistent effort to reach an adjustment with the Eagle Pass bank, and we find it difficult to believe that the charge-off would have been made, if the effect thereof would have been prejudicial, instead of highly beneficial, to the petitioner.

As above suggested, the decided cases are necessarily inconclusive upon the main question; but we note United States v. Frost, 25 Fed. Cas. 1221, No. 15,172, and Selden v. Heiner (D. C.) 12 F.(2d) 474, cited by petitioner, and Avery v. Com. (C. C. A.) 22 F.(2d) 6, 7, 55 A. L. R. 1277, Brown v. Com. (C. C. A.) 22 F.(2d) 797, Blair v. Curran (C. C. A.) 24 F.(2d) 390, Royal Packing Co. v. Com. (C. C. A.) 22 F.(2d) 536, and Piedmont Grocery Co. v. United States (decided by Court of Claims December 3, 1928).

Petition denied.