## MAYER TANK MFG. CO., Inc., v. COMMISSIONER OF INTERNAL REVENUE.

### No. 127.

Circuit Court of Appeals, Second Circuit.

March 14, 1942.

590

Alex M. Hamburg, of New York City (Jacob W. Friedman, of New York City, of Counsel), for petitioner.

Samuel O. Clark, Jr., Asst. Atty. Gen., and J. Louis Monarch and Michael H. Cardozo, IV, Sp. Assts. to the Atty. Gen., for respondent.

Before L. HAND, CHASE and FRANK, Circuit Judges.

FRANK, Circuit Judge.

1. The taxpayer had at all times, until it came before us, taken an all-or-nothing attitude toward the allowance of the claimed deduction. At no time did it suggest to the Commissioner that if 100% of the debt was not deductible, some smaller portion should be allowed as a deduction. Nor did it request the Board to determine whether there was partial worthlessness. We think that it is now too late to ask for such a determination. For the Commissioner, by virtue of the statutory provision[1] that he "may" allow a partial deduction, has some measure[2] of discretion in passing on a claim of partial worthlessness; an exercise of that discretion is a prerequisite to any review of his action by the Board. The taxpayer's position would require, in effect, that, if the debt was not wholly valueless in 1936, not only should we remand to the Board, but also that the Board should postpone decision until the Commissioner has decided whether he will allow a partial deduction of the debt. The litigation is too far advanced for such a disposition of the case. The only issue we can consider, therefore, is whether the debt was deductible in toto.

[1] Revenue Act of 1936, c. 690, 49 Stat. 1648:
"§ 23. Deductions from Gross Income.
"In computing net income there shall be allowed as deductions:
*     *     *     *     *     *     *
"(k) Bad Debts. Debts ascertained to be worthless and charged off within the taxable year (or, in the discretion of the Commissioner, a reasonable addition to a reserve for bad debts); and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction." 26 U.S.C.A. Int.Rev. Acts, page 828.

[2] What degree, we need not now decide. Cf. Paul, Studies in Federal Taxation (1937) 234, 238, 247, 260; Stranahan v. Commissioner, 6 Cir., 42 F.2d 729, certiorari denied 283 U.S. 822, 51 S.Ct. 346, 75 L.Ed. 1437; Clark v. Commissioner, 3 Cir., 85 F.2d 622.

**2.** In holding that it was not, the Board said, at the conclusion of its opinion: "In sum, the record does not present a picture of such hopelessness or worthlessness as, in our judgment, to warrant a reasonable man in concluding that the account was worthless." The taxpayer asserts that this "objective" standard is not legally pertinent, but that the Board should have applied a "subjective test," i. e., it should have determined whether this particular taxpayer, in good faith, believed in 1936 that the debt was worthless. That argument is founded on a surprising misinterpretation of some of our decisions. We have held that, if a debt actually becomes worthless in a given year, the taxpayer, notwithstanding that a reasonably prudent person would in that year so have believed, may deduct the debt in a later year, provided that, in good faith and without "shutting his eyes," he then first ascertained the fact as to its worthlessness.[3] But there is no room for any element of subjectivity with reference to the issue whether, in fact, the debt lacked value. That a taxpayer, whatever may be his good faith, believes a debt to be valueless does not make it so. Only debts which have no value (in whole or in part) are deductible. The statute speaks of "debts ascertained to be worthless," and (no matter what some persons may assert in the realm of metaphysics) for tax purposes one cannot be said to ascertain what in truth does not exist.[4] The personal illusions of the individual taxpayer as to that fact cannot reduce his taxes.[5] While, then, we have held that a taxpayer's innocent failure to discover a debtor's insolvency may, in some circumstances, justify postponement of the date of deduction of a bad debt, we did not say or imply that an innocent but erroneous belief in such insolvency warranted an acceleration of that date. "The failure to 'ascertain' that a debt has become 'bad' in the year that it becomes so has nothing in common with mistakenly 'ascertaining' that it has become bad when it has not." [124 F.2d 476.][6] As to that fact, the "subjective test" is irrelevant. And the views of the lawyers' jack-of-all trades, "the reasonable man," constitute objectivity for legal purposes. Consequently, the Board correctly used as a yardstick what a reasonable man would have concluded as to the worthlessness of the debt in question here.

**3.** It is plain that there was substantial evidence to sustain the Board's findings that the debt was not wholly worthless. $6,380.80 of that debt was secured by a conditional sale title to certain tanks. Even if we regarded nothing except the testimony on which the taxpayer relies, that secured portion of the debt was not devoid of all value. For taxpayer's President testified that the tanks had "a marketable value" of not less than 10% of their sale price of $7,230.80. The secured part of the debt, then, was worth at least $723.

Assuming, arguendo, that the unsecured portion of the debt constituted a separate claim, there is ample evidence to sustain the Board's finding that it, too, was not without some value. The debtor, before and in 1936, and down to the date of the hearing before the Board in October, 1940, was in reorganization proceedings under Section 77B of the Bankruptcy Act. It is the duty of the Bankruptcy Court to dismiss such a proceeding when there is no longer a likelihood of consummating a reorganization plan. See 3 Gerdes, Corporate Reorganizations (1936) pp. 1837-1840 and cases cited. Moreover, there is no evidence that the taxpayer or any other creditor ever suggested such a dismissal.[7] These facts raise a strong presumption that reorganization was by no means hopeless, even if a particular plan, at one time pro-

---

[3] Curry v. Commissioner, 2 Cir., 117 F.2d 307, 309, 310; Moore v. Commissioner, 2 Cir., 101 F.2d 704, 706; Herskovits v. Commissioner, 2 Cir., 110 F.2d 272, 273; Rosenthal v. Helvering, 2 Cir., December 30, 1941, 124 F.2d 474.

Some other courts have applied an "objective" test; see, e.g., Sabath v. Commissioner, 7 Cir., 100 F.2d 569; Avery v. Commissioner, 5 Cir., 22 F.2d 6, 55 A.L.R. 1277.

[4] Fortunately, we need not, as judges, express our opinion as to the soundness of the philosophic thesis, entertained by some, that, at least for some purposes, the "truth," at any given time and place, consists of the subjective beliefs of the majority of persons at that time and place.

[5] In high-brow terms, solipsism is here out of place.

[6] Rosenthal v. Helvering, supra.

[7] Indeed, the August, 1935, circular letter of the Creditors' Committee, put in evidence by taxpayer, shows that that Committee, while objecting to a reorganization plan proposed by the debtor, contemplated formulating one of its own.

posed by the debtor, was not feasible. That presumption is not overcome by the testimony of taxpayer's President, Mayer, that one of the debtor's trustees in bankruptcy stated, late in 1936, that the estate could then pay nothing in cash to taxpayer, and that, if the creditors forced liquidation, they would receive nothing.[8]

Indeed, the continuance of the Section 77B proceeding might well be sufficient to sustain a finding that the debt was not even partially worthless; for it serves to show that reorganization is still to be regarded as likely; and there is no way of ascertaining what will be the value of the securities, in a reorganized going concern, which the taxpayer will receive. "What has concluded that we should conclude about it?" However, as shown above, that question of partial worthlessness is not before us.[9]

The presumption is not overcome by the testimony of taxpayer's secretary, Mehler, that he came to the conclusion, after examining the debtor's plant, that it "would not bring" more than $150,000. That was an estimate of liquidation, not going concern, value. Moreover, he was not qualified as an expert; on objection, it was explained by taxpayer's counsel that he was merely expressing "an opinion as * * * officer" of the taxpayer. That explanation, coupled with another made in connection with the admission of an exhibit, discloses that this testimony was designed to prove the taxpayer's "subjective" attitude towards the worthlessness of the debt.

The exhibit just referred to was a report by the creditor's committee made in August, 1935. Considering the limited purpose for which it was offered in evidence, the Board was surely not in error in giving little weight to its statement of facts concerning the "objective" financial condition of the debtor. We cannot say that the Board, which heard the witnesses, was not justified in giving less weight to that exhibit and to ·Mehler's "valuation" testimony than to debtor's book figures which showed a net worth—after deducting all preferred claims and a reasonable estimate of administration expenses—in excess of the unsecured claims.[10] And even if the "valuation" figures of taxpayer's officers were considered conclusive, there would be something for the unsecured creditors.

The order of the Board of Tax Appeals is affirmed.

---

[8] Other testimony shows that that statement must have related merely to the unsecured claims.

[9] If it were, we would find it impossible to determine, on this record, if there were partial worthlessness, how much it would be. Since that is true, the Board could not have made a. finding on the subject, even if that question had been raised before it.

[10] The Board said: "The facts are that although reorganization had not been effected and Burton had been unsuccessful in attempting to obtain a loan, the operation by the trustee had, in 1936, shown an⸱ increasingly favorable condition. As of January 31, 1935, sales were roughly $475,000, gross profit on sales $134,000, net loss $81,000. As of January 31, 1936, sales rose to $634,-000, gross profit to $319,000, with a negligible net loss of $169.95. As of January 31, 1937, which includes most of the taxable year, sales rose further to $978,000, gross profit to $457,000, with a net loss of but $6,634.13. Though the book entries of value of assets are not conclusive, they are not to be ignored where the record contains no adequate proof showing substantially less values than those carried. In the face of the book records such as are here present, we can give little weight to the testimony of petitioner's secretary that the Burton plant would not bring more than $150,000. Further, it is noted that Burton had a surplus of $574,000, plus the surplus of the trustee of $73,000."